**E-FILED on**   6/8/07

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ALBERT RICHARD PAN,<br><br>    Plaintiff,<br><br>    v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY; STATE FARM INSURANCE COMPANIES; and DOES 1 through 50, inclusive,<br><br>    Defendants. | No. C-05-05208 RMW<br><br>ORDER GRANTING STATE FARM'S MOTION FOR SUMMARY JUDGMENT<br><br>**[Re Docket Nos. 105, 111]** |

This action arises from an underinsured motorist claim following an accident in which plaintiff Albert Richard Pan was struck by a motor vehicle while crossing the street. After submitting his claims for payment by defendant State Farm Automobile Insurance Company ("State Farm"), plaintiff filed a suit in the California Superior Court on November 10, 2005, seeking, *inter alia*, to compel arbitration. The action was removed to this court. Plaintiff's complaint also included causes of action (1) for declaratory relief that he was covered by the State Farm policy at issue and entitled to benefits under it, (2) to compel discovery in the arbitration, (3) for breach of contract, (4) for breach of the implied covenant of good faith and fair dealing, and (5) for bad faith. After settling his claim with State Farm, plaintiff dismissed his first and second claims. State Farm now moves for

summary judgment on plaintiff's remaining claims. For the reasons set forth below, the court grants State Farm's motion.

## I. BACKGROUND

Plaintiff was crossing the street in San Jose at Winchester Boulevard and Van Sansul Avenue when he was struck and injured by an automobile driven by Ms. Hong Dan on January 16, 2003, resulting in extensive injuries. The accident occurred at approximately 6:40 p.m. and was witnessed by Joe Trusty. Officer Andrew Wong responded to the scene and filed a police report, No. 03-016-1043, which included statements by plaintiff, Dan, and Trusty. Decl. Lorna Carroll ("Carroll Decl."), Ex. 6. The police report recorded Trusty's statement as follows:

> The (w) stated that he was standing outside of his building having a cigarette. (W) was watching the traffic on Winchester Blvd. when he saw the pedestrian standing near the median on Winchester Blvd. The pedestrian was attempting to cross to the ECL of Winchester. (W) saw Dan coming (N/B) in the #2 (N/B) lane at approx. 40 mph. The driver had functioning headlamps. The (w) momentarily turned to the right then heard a "crunch." When the (w) turned back to his left, he saw the pedestrian flying through the air.

Dan's statement was recorded as follows:

> (D-2) stated that she was traveling (N/B) in the #2 lane traveling approx. 40 mph. (D-2) said that she was approaching Payne Ave. on a green light. When (D-2) was passing Van Sansul, she saw a dark shadow by the right side of her vehicle and then heard a crunch. (D-2) then pulled to the right shoulder and saw the pedestrian laying on the ground. (D-2) said she did not see the pedestrian until the collision.

Plaintiff's statement was recorded as follows:

> (Ped) Pan states that he was crossing the street from the WCL to the ECL when he was struck by the vehicle. (Ped) Pan said he never saw the vehicle.

*Id.* The police report indicated that the plaintiff was wearing a black jacket and blue pants and concluded that plaintiff was "at fault for crossing the roadway not in a crosswalk." *Id.*

Plaintiff settled his claim against the driver of the vehicle, Ms. Dan, on May 11, 2005 for Dan's automobile insurance policy limits of $50,000. Carroll Decl., Ex. 2. Plaintiff filed an underinsured motorist claim as an additional insured under the policy of his cousin, Robert Van. That policy, Policy No. 031-8951-A23-05A, was issued by State Farm and provided undersinsured motorist coverage with policy limits of $250,000.

1   Plaintiff maintains that State Farm has breached the terms of the insurance policy, the
2 covenant of good faith and fair dealing, and acted in bad faith in settling his claim.  He contends that
3 State Farm has unreasonably delayed payment of his claim and low-balled the amount of his claim,
4 causing him to settle for a lower amount because he was concerned about his health and began to
5 argue with his family about payment for assistance they were providing for him.  *See* Declaration of
6 Albert Pan ¶¶ 13-14.[1]

7   **A.   Timeline of State Farm's Claim Handling**

8   Plaintiff orally commenced his claim on or around May 6, 2005.  Decl. William Dresser
9 ("Dresser Decl.") ¶ 5.[2]  On May 9, 2005, State Farm acknowledged the notification regarding the
10 accident, but questioned its duty to pay, stating "It is questionable whether Albert Pan is a relative of
11 the first person named as an insured or of his spouse, so as to be an insured as defined in the policy."
12 Carroll Decl., Ex. 3.  On May 11, 2005, plaintiff sent State Farm documentation regarding the
13 accident, specifically, the police report from the accident, the release and settlement with Ms. Dan,
14 and documentation regarding plaintiff's residence and relationship to Robert Van.  Dresser Decl., Ex.
15 A.  On May 26, 2005, plaintiff sent State Farm a demand package that included 350 pages of
16 supporting documents documenting his medical treatment and follow-up care.  *Id.*, Ex. A.  The
17 demand letter itemized plaintiff's medical expenses, which amounted to $151,728.77, explaining that
18 plaintiff would forward additional documentation regarding surgery plaintiff anticipated having.  *Id.*
19 This initial documentation did not include bills for residential aftercare following plaintiff's
20 hospitalization.

21   State Farm took two statements from plaintiff on June 3, 2005, and plaintiff provided rent
22 receipts and a bill (on credit) from his ex-wife and cousin for around-the-clock care on that same
23 date.  Dresser Decl., Exs. C - E.  On July 22, 2006, State Farm confirmed its determination that
24 plaintiff was covered as a resident relative of Robert Pan.  Carroll Decl., Ex. 14.

---

[1] State Farm's objections to the Declaration of Albert Pan are overruled.  The court will, of course, disregard the contents of Pan's declarations to the extent that they seek to assert legal conclusions.

[2] State Farm objects to this statement in Dresser's declaration as containing hearsay.  The court overrules this objection and considers this statement to the extent necessary to establish that an oral claim was made on or around May 6, 2005.

ORDER GRANTING STATE FARM'S MOTION FOR SUMMARY JUDGMENT—No. C-05-05208 RMW
MAG                                                                         3

*(Left margin: **United States District Court** / For the Northern District of California)*

On July 22, 2005, State Farm claim representative Nicole Peterson also informed plaintiff that State Farm had determined him to be 75% at fault for the accident and that his claim would be subject to a downward adjustment reflecting that determination. Carroll Decl., Ex. 15. By letter dated August 8, 2005 plaintiff protested this determination to Peterson and demanded that State Farm tender the underinsured motorist policy limits. Carroll Decl., Ex. 17; *see also* Dresser Decl., Ex. J (August 17, 2005 letter to Ms Jordan-Brown protesting liability determination). Peterson acknowledged plaintiff's letter on August 9, 2005. Carroll Decl, Ex. 18. The parties continued to exchange letters disagreeing over the liability determination through the middle of August 2005.

On August 8, 2005, plaintiff separately mailed a letter demanding that underinsured motorist arbitration be commenced. Carroll Decl., Ex. 16. State Farm claims that this letter, although sent return receipt requested, was not received by Peterson until September 15, 2005 because it was not scanned in and transmitted to Peterson by the mail center at which it was received. Hysinger Decl., Ex. 49, Dep. Robert Thompson at 34:9-36:3. The parties executed a stipulation agreeing to the Honorable Lendard Sprinkles as an arbitrator on December 30, 2006. Hysinger Decl., Ex. 39. As of January 2006, arbitration had not yet been initiated. *See, e.g.*, Dresser Decl., Ex. CC (January 25, 2006 letter from plaintiff seeking status of selection of arbitrator).

On September 15, 2005, State Farm offered plaintiff $24,000 to settle his claim, which was immediately rejected by plaintiff, who counteroffered $150,000. Carroll Decl., Ex. 23. Plaintiff's letter from that date also notes that Peterson did not have a copy of the arbitration request or the subsequent discovery requests propounded to State Farm. *Id.* On September 16, 2005, State Farm acknowledged that negotiations had reached an impasse and advanced $24,000, the amount of its original offer, as the minimum amount of recovery, leaving the claim open and stating that the remaining coverage would be reduced by the amount of the advance. Carroll Decl., Ex. 24. On that date, Peterson also informed plaintiff that she had received his request for arbitration by fax and would be referring the file to outside counsel, Pave & Bogaards. Carroll Decl., Ex. 25. State Farm paid plaintiff the $25,000 medical payments coverage policy limits on or about September 28, 2005. Hysinger Decl., Thompson Dep. at 121:21-122:10.

Thereafter, the parties conducted interviews and investigations. Plaintiff submitted to an independent medical evaluation by Dr. John Missirian on December 12, 2005. Carroll Decl., Ex. 28. The evaluation was supplemented twice – once in January 2006 (with previously-taken x-rays) and again in February 2006 (with the depositions of witnesses and plaintiff). Outside counsel submitted their evaluation of plaintiff's claim on January 27, 2006, concluding that plaintiff was 50% at fault. Carroll Decl., Ex. 31. State Farm also received a report from Dr. Richard Stuart, an accident reconstruction expert, on March 15, 2006. Carroll Decl., Ex. 33.

On February 8, 2006, plaintiff sent a settlement offer of $175,000 new money (in addition to the $24,000 advanced on September 15, 2005) to resolve all claims against State Farm, including all policy, contract and tort claims. Carroll Decl., Ex. 32. State Farm, through outside counsel, counteroffered $55,000. Thereafter, it appears that plaintiff made a subsequent demand for $120,000.[3] In an April 6, 2006 letter transmitting plaintiff's $120,000 counteroffer to State Farm, outside counsel again stated that they believed plaintiff was approximately 50% at fault and recommended immediate mediation. Carroll Decl., Ex. 34. Four days later on April 10, 2006, outside counsel recommended accepting plaintiff's $120,000 demand. Carroll Decl., Ex. 35. The parties settled plaintiff's claim on April 11, 2006 for $120,000 new money, a total of $144,000 including the $24,000 advance. Decl. David Hysinger ("Hysinger Decl."), Exs. 40-41.

**B.     Comparative Fault**

It is undisputed that State Farm attributed substantial comparative fault to plaintiff for the January 16, 2003 accident throughout its handling of plaintiff's claim for failing to be in a crosswalk when he was stuck by Ms. Dan. *See* Carroll Decl., Ex. 15 (assigning 75% fault); *id.*, Exs. 27, 34 (assessing plaintiff's comparative fault at 50%). The parties do not dispute that plaintiff was not in a marked crosswalk when he was struck, however, they have vigorously disputed whether he was in an unmarked crosswalk. The parties do not dispute that there is no marked crosswalk at the

---

[3] The court was unable to identify written correspondence between the parties regarding State Farm's $55,000 counteroffer to plaintiff's $175,000 offer to settle claims or regarding plaintiff's subsequent demand of $120,000.

intersection of Winchester and Van Sansul where plaintiff was struck or that Van Sansul dead ends at Winchester and there is a short raised median running down the center of Winchester.[4]

Plaintiff explained that it was dark. He had crossed half of Winchester and stopped in the center divide. Carroll Decl., Ex. 10 at 3-4. As he attempted to cross from the center divide to the other side of Winchester, he was struck by Dan's vehicle. *Id.* at 2-4. There is no evidence that Dan was speeding or that her headlights were not functional. The impact threw plaintiff to the corner of Van Sansul. *Id.* at 3. Plaintiff acknowledged that there was no crosswalk, *id.* at 2, and Officer Wong's report concluded that "[b]ased upon statements, damage and physical evidence (Ped) Pan was at fault for crossing the roadway not in a crosswalk." Carroll Decl., Ex. 5.

In addition to assigning primary representative Nicole Peterson to plaintiff's claim,[5] State Farm assigned Tamara Jordan-Brown to investigate the issue of liability. Carroll Decl., Ex. 12. She determined plaintiff's liability to be 75%, which State Farm claim representative Peterson conveyed to plaintiff. Carroll Decl., Ex. 15. By letter dated August 8, 2005 plaintiff's counsel protested this determination to Peterson and demanded that State Farm tender the underinsured motorist policy limits. Carroll Decl., Ex. 17. Peterson acknowledged plaintiff's letter on August 9, 2005. Carroll Decl, Ex. 18. Plaintiff's counsel also contested the liability directly with Jordan-Brown. Dresser Decl., Ex. J. The parties exchanged letters arguing about the liability determination based upon the officer's report, California Vehicle Code provisions, and the California Driver's Handbook. Carroll Decl., Ex. 19. Plaintiff contended that he was in an unmarked crosswalk at the time of the accident because he was at the intersection of two streets. State Farm contended that he was not in a crosswalk, at first because it agreed with the assessment by Officer Wong that the raised median on Winchester prevented the Van Sansul from continuing through so as to be a crosswalk and then because its assessment of the intersection determined that because Van Sansul does not completely intersect Winchester, there is no unmarked crosswalk. State Farm's outside counsel and accident

---

[4] Plaintiff asserts that other facts regarding the intersection of these streets are relevant: there are signs on both sides of Winchester indicating Van Sansul, location of bushes, the State Farm adjuster's opinions regarding whether the street "looked like an alley." The court finds that these faces have marginal relevance.

[5] Plaintiff's claim was briefly assigned to Carley Castellanos. Sometime in June 2005, Nicole Peterson began handling plaintiff's claim.

ORDER GRANTING STATE FARM'S MOTION FOR SUMMARY JUDGMENT—No. C-05-05208 RMW
MAG                                          6

reconstruction expert concluded that, in any event, plaintiff was 50% to 100% at fault for the accident. Carroll Decl., Exs. 31 (outside counsel's January 27, 2006 evaluation of the case), 33 (accident reconstruction report dated March 15, 2006).

On September 6, 2005, Peterson completed an injury evaluation report on plaintiff's claim. Carroll Decl., Ex. 22. She calculated plaintiff's medical expenses at $172,423.87 and evaluated general damages to be between $80,000 and $135,000. By factoring in State Farm's comparative fault assignment and offsetting the $50,000 settlement with Dan, she determined that plaintiff's claim had a value between $13,105.97 to $26,855.97 new money. *Id.*

## II. ANALYSIS

### A. Breach of Contract Claim

State Farm asserts that plaintiff is not entitled to relief for breach of contract because it has paid all of the policy benefits to which plaintiff was entitled under the policy. Plaintiff concedes that the State Farm's payment of the settlement amount satisfies his claim for breach of the express contract, therefore the court dismisses this claim.[6]

### B. Breach of the Covenant of Good Faith and Fair Dealing and Bad Faith Claims

An insurance policy is a contract to provide certain benefits enumerated in the policy terms. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683 (1988). This principle applies equally to insurance policies. *Kransco v. American Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 400 (2000). The implied covenant of good faith and fair dealing supplements express contractual covenants "to prevent the contracting party from engaging in conduct that frustrates the other party's rights to benefits of the agreement." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 36 (1995). "Absent that contractual right, however, the implied covenant has nothing upon which to act as a supplement and 'should not be endowed with an existence independent of the contractual underpinnings.'" *Id.* (citing *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1153 (1990)).

---

[6] Plaintiff asserts that he is entitled to damages for State Farm's mishandling of the claim (interest, attorney's fees, costs). He characterizes these as claims arising under the contractual prong of his claim for breach of the covenant of good faith and fair dealing.

To establish a breach of the implied covenant of good faith and fair dealing under California law, a plaintiff must show: "(1) benefits due under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause." *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151 (1990). The mistaken or erroneous withholding of policy benefits, if reasonable or based on a legitimate dispute as to the insurer's liability under California law, will not expose the insurer to liability for bad faith. *Morris v. Paul Revere Life Ins. Co.*, 109 Cal. App. 4th 966, 977 (2003) ("As long as the insurer's coverage decision was reasonable, it will have no liability for breach of the covenant of good faith and fair dealing. An insurer which denies benefits reasonably, but incorrectly, will be liable only for damages flowing from the breach of contract, i.e., the policy benefits.").

"[B]efore an [insurer] can be found to have acted tortiously, *i.e.*, in bad faith, in refusing to bestow policy benefits, it must have done so 'without proper cause.' " *Morris*, 109 Cal. App. 4th at 973 (citing *California Shoppers, Inc. v. Royal Globe Ins. Co.,* 175 Cal. App. 3d 1, 54-55 (1985)). "[T]he ultimate test of [bad faith] liability in the first party cases is whether the refusal to pay policy benefits was unreasonable." *Id.* (citing *Austero v. National Cas. Co.*, 84 Cal. App. 3d 1, 32 (1978), *overruled on other grounds in Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 824 (1979)); *see also Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (2001).

### 1. Delay

Plaintiff bases his bad faith claim on State Farm's delay in paying his insurance claim. "Before an insurer can be found to have acted in bad faith for its delay or denial in the payment of policy benefits, it must be shown that the insurer acted unreasonably or without proper cause." *Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1072 (2007). Whether a delay in paying an insurance claim is an unreasonable one is usually a question of fact. *Paulfrey v. Blue Chip Stamps,* 150 Cal. App. 3d 187, 194 (1983). But "[w]hile the reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact, it becomes a question of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence." *Chateau Chamberay Homeowners Ass'n v. Associated Intern. Ins. Co.*, 90 Cal. App. 4th 335, 346 (2001). In particular, "as long as there is no dispute as to the underlying facts, it is for the court, not a jury, to decide whether the insurer had 'proper cause.'" *Id.* at 350. Here, there is no dispute as to the underlying facts regarding the timeline leading

to Pan's settlement with State Farm for $120,000 new money. Based on the undisputed facts presented, the court concludes that the claims process to the point that the claim was referred to outside counsel, while certainly not the most efficient, was not unreasonable. State Farm legitimately identified a question as to plaintiff's coverage under his cousin's policy, which took approximately two months (from mid-May to mid-July) to resolve. On July 22, 2005, State Farm informed plaintiff of its determination that he was 75% at fault for the accident. Plaintiff contested this finding and continued to make his case directly to State Farm representatives through September 2005, until State Farm retained counsel.

State Farm completed its evaluation of plaintiff's damages in mid-September 2005. Carroll Decl., Ex. 22. Although plaintiff contends that the time it took to complete the evaluation was unreasonable because State Farm's subsequent requests for supplementary information about plaintiff's medical expenses did not come until August, two months after plaintiff submitted his demand package including his medical claims, the court does not find the delay to be an unreasonable one. This is particularly so in light of the fact that State Farm kept plaintiff informed as to when the evaluation would be completed. *See* Carroll Decl., Ex. 18 (August 9, 2005 letter from Peterson to plaintiff stating "As I advised you previously in my letter dated July 22, 2005 and our conversation of the same date, my evaluation will be completed by August 22, 2005. . . ."); *id.*, Ex. 20 (August 15, 2005 letter from Petrson to plaintiff stating "I will be unable to complete my evaluation by 8/22/05 as the documentation for Mr. Pan's claim appears to be incomplete at this time.").

Plaintiff made a demand for policy limits on August 8, 2005, Carroll Decl., Ex 17, to which State Farm responded the next day stating that evaluation was ongoing and would continue until August 22, 2005, requesting additional medical records, *id.*, Ex. 20, which plaintiff provided on August 22, 2006, *id.*, Ex. 21. State Farm then came forth with its first offer to settle on September 15, 2005 at $24,000, which plaintiff immediately rejected, demanding the policy limits instead. Carroll Decl., Ex. 23. Recognizing the impasse, the next day State Farm advanced $24,000 to plaintiff as a minimum recovery, recognizing that additional negotiations would occur and additional payment might follow. Carroll Decl., Ex. 24. Contrary to plaintiff's assertion that State Farm "refused to respond to requests to resolve the UIM claim by settlement," Opp'n at 10, this was a reasonable course of action and was taken within a reasonable amount of time from the completion of damages assessment conducted by State Farm.

Plaintiff's best argument for bad faith based on delay arises from his demand for arbitration. The undisputed facts establish that plaintiff requested arbitration on August 6, 2005. Even discounting the delay attributable to its failure to process the arbitration demand,[7] State Farm did not select an arbitrator until December 30, 2005. Hysinger Decl., Ex. 39. Although State Farm made a motion before this court to stay the current action pending completion of binding arbitration, it does not appear that the parties ever entered arbitration, instead settling the claim in April 2006. Nevertheless, the evidence indicates that once State Farm retained counsel to address plaintiff's arbitration demand, the case moved forward: outside counsel sent an evaluation of plaintiff's claim to State Farm on September 28, 2005, Carroll Decl., Ex. 28; outside counsel sent plaintiff a letter stating that they would need an independent medical examination to evaluate his claim on October 21, 2005, Hysinger Decl., Ex. 36, and another on November 8, 2005, explaining that it was also necessary to depose Officer Wong, *id.*, Ex. 38; plaintiff was examined on December 12, 2005, Carroll Decl., Ex. 28; and depositions of Officer Wong and Joe Trusty were taken in January 2006. After this supplemental discovery, State Farm received an evaluation and recommendation regarding plaintiff's claim from its outside counsel on January 27, 2006. Carroll Decl., Ex. 31. On March 15, 2006, State Farm obtained an accident reconstruction report prepared by Dr. Richard Stuart. Carroll Decl., Ex. 33. In the present case, plaintiff noticed motions to compel and for sanctions and defendant noticed motions to stay and for a protective order. *See, e.g.*, Docket Nos. 14, 18, 63, 69, 72 (plaintiffs motions, noticed on January 23, 2006, March 21, 2006 and March 28, 2006); 26, 54 (defendant's motions, renoticed for January 27, 2006 after defendant declined to proceed before a magistrate judge, and for March 3, 2006).

Although State Farm did not display the utmost speed in addressing plaintiff's request for arbitration, the need for an independent medical examination and depositions of the officer and witness from the evening of the accident in preparation for arbitration along with the co-pending suit makes the delays at least reasonable under the circumstances. Neither State Farm nor its outside counsel ceased

---

[7] This delay, standing alone, would not be sufficient basis for a bad faith claim in light of State Farm's undisputed explanation that it failed to properly process the demand and forward it to the adjuster, because "[i]n California, mere negligence is not enough to constitute unreasonable behavior for the purpose of establishing a breach of the implied covenant of good faith and fair dealing in an insurance case." *Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1166 (1995).

to investigate the claim at any time or refused to explore or investigate the facts surrounding the accident or plaintiff's consequent medical needs. Accordingly, the court concludes that State Farm's actions were reasonable and do not subject it to a claim for breach of the covenant of good faith and fair dealing or for bad faith by plaintiff.

### 2.     Low Offer

Plaintiff's bad faith claim is also based on State Farm's low-ball offer to settle. State Farm asserts that its offer to settle was reasonable in light of its assessment of plaintiff's damages and its reasonable assessment of relative liability. Here again, the parties agree on the facts of Pan's accident, only the legal conclusions to be drawn as to the existence of an unmarked crosswalk and contributory liability are disputed. The parties also dispute the reasonableness of State Farm's assessment of general damages, which State Farm assessed to be the $80,000 to $135,000 range, then reduced by 75%. *See* Carroll Decl., Ex. 22.

Plaintiff's evidence fails to establish that State Farm's general damages assessment was unreasonable. The declaration of plaintiff's expert, Mitchell Frankel, regarding general damages is conclusionary and does not create an issue of material fact as to the reasonableness of State Farm's assessment. Decl. of Mitchell Frankel at 9 ("State Farm gave an arbitrary dollar figure for general damages which was grossly and unreasonably low. State Farm extremely undervalued the value of the general damages in light of the information it had concerning the nature, extent and duration of Albert Pan's injuries. State Farm failed to follow usual industry standards in evaluating general damages. General damages should have been assessed in the range of $300,000 to $600,000 if not more.").

The court also concludes that the comparative liability dispute was a reasonable one, particularly in light of Officer Wong's assessment that plaintiff was at fault for the accident. Officer Wong's report concluded, "Based upon statements, damage and physical evidence (Ped) Pan was at fault for crossing the roadway not in a crosswalk." Carroll Decl., Ex. 6. Even if incorrect, State Farm's assessment that there was no crosswalk was reasonable given the officer's assessment, the presence of a marked crosswalk approximately 150 feet from the intersection, and the legal uncertainty about whether there was a crosswalk at the intersection of Winchester and Van Sansul. Further, the circumstances of the accident (that it occurred at night, plaintiff was wearing dark clothing, that Dan's headlights were

functional and she was not speeding) would make it reasonable to assign significant fault to plaintiff. The court concludes that State Farm reasonably disputed the amount of plaintiff's comparative fault. It is also relevant that plaintiff made policy limit demands until September 15, 2005, when he lowered his demand to $150,000, then offered to settle claims for $175,000 on February 8, 2006, and finally lowered his demand to $120,000 on or around April 6, 2006,[8] which State Farm accepted five days later on April 10, 2006.

### 3. Withholding Documents

In support of his claims for bad faith and punitive damages, plaintiff argues that State Farm withheld important documents during the claims adjusting process and subsequently from production. Specifically, plaintiff asserts that State Farm declined to produce photographs and diagrams created by its accident reconstruction expert, and internal reports created by the adjuster, Peterson. Plaintiff argues that the failure to produce this information prevented him from knowing what reasons State Farm may have had to reduce benefits under the policy. According to plaintiff, State Farm's withholding of this information prevented him from addressing their true bases for denying the full value of his claim. He asserts that he should have been apprised during the claims process of every theory State Farm may have had for denying or reducing his claim so that he could counter any adverse determination made by the adjuster as well as monitor the adjusting practices of the State Farm personnel.[9]

---

[8] As noted above, the court was not able to locate correspondence indicating exactly when plaintiff submitted his final demand for $120,000, but it appears to have been approximately April 6, 2006. See Carroll Decl., Ex. 34 ("Enclosed please find claimant's counsel's response to our recent settlement offer of $55,000. Claimant's demand at the time of our offer was $175,000. In response to our offer of $55,000, claimant dropped his demand to $120,000.") (referenced "claimant's counsel's response" not provided).

[9] In support of his assertion that State Farm's actions in adjusting plaintiff's claims fell below the standard of care, plaintiff presents the declaration of his attorney, William Dresser, which provides testimony regarding the standard of care for a claims adjuster. State Farm objects to Dresser's declaration in its entirety because Dresser was not disclosed as an expert witness. *See* Decl. Stephen Ellingson Supp. Objections to Evidence, Exs. 54, 55 (plaintiff's initial and further expert witness disclosure, neither showing Dresser as an expert witness). Because Dresser is also plaintiff's attorney, the court declines to strike his testimony in its entirety, but strikes the portions in which he opines on the standard of care, specifically, paragraphs 25 to the extent that Dresser opines as to adjusters' knowledge; paragraphs 27 and 31 to the extent they assert what constitutes unreasonable behavior by State Farm and paragraph 32. The court also strikes the portions of Dresser's declaration that constitution hearsay, in particular, his assertions about why plaintiff's claim settled for less than the policy limits in paragraphs 27, 29 and 30 (except to the extent that it asserts that Dresser was authorized to make payments from any settlement of this case). State Farm's other

ORDER GRANTING STATE FARM'S MOTION FOR SUMMARY JUDGMENT—No. C-05-05208 RMW
MAG                                                                                 12

1    Based on the information plaintiff was able to discover, he asserts that State Farm's reasons for
2 assigning liability to him shifted over time.  According to plaintiff, State Farm first assigned 75%
3 liability because of the assertion that plaintiff was not in a crosswalk when he was struck, then it shifted
4 its liability assignment to 50%, relying on a theory based upon plaintiff's purported inattention to the
5 traffic and his crossing the street in the dark wearing dark clothing.  The evidence plaintiff cites does
6 not support his theory that State Farm serially abandoned its positions to provide shifting liability
7 theories or that State Farms adjusters admitted that the reasons given for their assessment of plaintiff's
8 liability were invalid.  At best, the evidence presented shows that State Farm's downward adjustment
9 of its assessment of plaintiff's liability was an in response to an acknowledgment that there might be a
10 legitimate legal argument whether plaintiff was in an unmarked crosswalk at Winchester and Van
11 Sansul.  The evidence presented simply provides further support for the liability assessment, assuming
12 in the alternative that plaintiff was in an unmarked crosswalk.  *See* Carroll Decl., Ex. 31, January 27,
13 2006 Evaluation by Pave and Bogaards at  9 ("Therefore, Pan was not crossing in an unmarked
14 crosswalk.  He did not have the right of way on Winchester Boulevard at Van Sansul Avenue. . . . On
15 the other hand, the non-existence of an unmarked crosswalk is disputed, and the arbitrator may reject
16 our analysis and interpretation of Vehicle Code Section 275. . . . However, even in [the case Dan failed
17 to yield to a pedestrian crossing in an unmarked crosswalk in violation of Vehicle Code Section 21950],
18 Pan remains comparatively negligent . . . .")

19    Even assuming that State Farm changed its theory of contributory liability mid-negotiation, it
20 did not have a duty to plaintiff to be totally transparent as to its reasoning for the reduction in benefits
21 it offered to pay.  State Farm informed plaintiff of its liability assessment and the general basis therefor.
22 Carroll Decl., Ex. 15 (July 22, 2005 letter from State Farm assigning 75% liability).  Plaintiff set forth
23 his disagreements, which State Farm acknowledged, then State Farm spoke with plaintiff's attorney
24 about them.  Carroll Decl., Exs. 17-20, Dresser Decl., Ex. K.   It is true that "an insurer cannot

---

objections as to Dresser's declaration are overruled.  To the extent it has considered Dresser's declaration, the court shall, however, consider its contents carefully, recognizing that it contains a significant amount of argument and legal conclusion.  With or without Dresser's declaration, there is no evidence that a lack of training contributed to the disputes raised in the claims process, particularly in light of Officer Wong's conclusion that plaintiff was contributorily negligent the night of the accident.

ORDER GRANTING STATE FARM'S MOTION FOR SUMMARY JUDGMENT—No. C-05-05208 RMW
MAG                                              13

1 reasonably and in good faith deny payments to its insured without fully investigating the grounds for
2 its denial." *Jordan*, 148 Cal. App. 4th at 1072 (citing *Frommoethelydo v. Fire Ins. Exchange*, 42 Cal.3d
3 208, 214-215 (1986)) (italics omitted).  However, the evidence does not establish that State Farm failed
4 to conduct a reasonable and thorough investigation of plaintiff's case.  The liability dispute between the
5 parties concerned interpretation of the law rather than an investigation of the facts.  Thus, there is no
6 evidence that further investigation by State Farm would have disclosed *facts* showing that would have
7 changed State Farm's assessment.  *See id.* at 1074 ("[W]here an insurer denies coverage but a reasonable
8 investigation would have disclosed facts showing the claim was covered, the insurer's failure to
9 investigate breaches its implied covenant.").  Past the duty to conduct a thorough investigation, there
10 is no basis for establishing a duty on behalf of State Farm to permit plaintiff or his counsel to micro-
11 manage the claims adjustment process.

### 4. Punitive Damages

13       A plaintiff may be entitled to recover punitive damages if he can prove that the insurer "not only
14 denied or delayed the payment of policy benefits unreasonably or without proper cause, but, in doing
15 so, was guilty of malice, oppression or fraud." *Jordan*, 148 Cal. App. 4th at 1080.  To be entitled to
16 punitive damages, plaintiff must prove by clear and convincing evidence that State Farm acted with
17 "oppression, fraud, or malice." Cal. Civ. Code § 3294.  "The evidence required to support an award of
18 punitive damages for breach of the implied covenant of good faith and fair dealing is 'of a different
19 dimension' from that needed to support a finding of bad faith. *Shade Foods, Inc. v. Innovative Products
20 Sales & Marketing, Inc.*, 78 Cal. App. 4th 847, 909 (2000) (citing *Tomaselli v. Transamerica Ins. Co.*,
21 25 Cal. App. 4th 1269, 1286 (1994)).  Here, because the court finds that the evidence does not support
22 a finding of bad faith, plaintiff's claim for punitive damages likewise fails.  Even had the court found
23 sufficient evidence of bad faith to survive summary judgment, however, it would still conclude that
24 plaintiff is not entitled to punitive damages.  *Id.* at 909-10 ("A marginally sufficient case of bad faith
25 is not likely to prove malice or oppression by clear and convincing evidence.").  As set forth above,
26 plaintiff's contentions that State Farm withheld documents during production, that State Farm had no

legitimate basis to dispute plaintiff's damages, and that its adjusters have admitted that there was no legitimate basis for assigning liability to plaintiff are without basis.[10]

### III. ORDER

For the foregoing reasons, the court grants State Farm's motion for summary judgment on plaintiff's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, bad faith, and punitive damages.

DATED:    6/8/07

*Ronald M Whyte*
RONALD M. WHYTE
United States District Judge

---

[10] Plaintiff's additional contention that State Farm forced him to settle because of his fears about his health and the disagreements with his family are also insufficient to support a bad faith claim. Plaintiff has presented no evidence that these concerns were relayed to State Farm or played any part in their decisions in processing plaintiff's claim.

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff:**

Richard Swensen
William C. Dresser      loofwcd@aol.com

**Counsel for Defendants:**

Stephen P. Ellingson      sellingson@hayesdavis.com
Stephen M. Hayes      shayes@hayesdavis.com

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:** 6/8/07                                       /s/ MAG
                                                                       **Chambers of Judge Whyte**